UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES T. MARKOVITZ, | : | |
| | : | |
| Plaintiff, | : | No. 3:19-CV-1150 (VLB) |
| | : | |
| v. | : | |
| | : | September 15, 2020 |
| ANDREW M. SAUL, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF DECISION DENYING MOTION TO REVERSE
THE DECISION OF THE COMMISSIONER, [ECF NO. 29], AND GRANTING
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER, [ECF NO. 25]**

Before the Court is an administrative appeal filed by Plaintiff James T. Markovitz ("Claimant") pursuant to 42 U.S.C. § 405(g) following the denial of his application for Title II Social Security Disability ("SSDI") benefits.[1] Claimant moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner") and remanding the case pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on the basis that Administrative Law Judge ("ALJ") Matthew

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). 20 C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Kuperstein erred in evaluating Claimant's evidence of disability, which caused the ALJ to improperly deny Claimant disability benefits, and because the ALJ failed to adequately develop the evidence of record.  *See* [ECF No. 29 (Mot. to Reverse the Decision of the Comm'r)].  The Commissioner moves to affirm the decision of the Commissioner below, arguing that it is supported by substantial evidence and that the ALJ did adequately develop the record, as required.  [ECF No. 25-2 (Mem. in Supp. of Mot. to Affirm the Decision of the Comm'r)].  For the following reasons, the Commissioner's Motion for an Order Affirming the Commissioner's Decision is GRANTED, and Claimant's Motion to Reverse the Decision of the Commissioner is DENIED.

I.   Background

The Commissioner filed a Statement of Material Facts containing a review of the procedural history and facts from the Administrative Record.  [ECF No. 25-1].  Claimant failed to file a Statement of Material Facts.  The Court has reviewed the evidence and adopts the Commissioner's Statement of Facts, as supplemented by the record, hereby incorporating it into this opinion.

Claimant was born on November 8, 1961 and alleged his disability began on November 17, 2004 when he was 43 years old.  (R. 214).  On January 21, 2017, Claimant applied for SSDI benefits.  (R. 214-15).  Claimant's application was denied initially on March 27, 2017, (R. 159-62), and upon reconsideration on June 14, 2017.  (R. 164-67).

Claimant requested a hearing before an Administrative Law Judge ("ALJ"), (R. 168-69), and appeared on March 8, 2018 before ALJ Matthew Kuperstein.  (R. 52-136).  At the hearing, the ALJ allowed Claimant to amend his alleged onset date

to October 28, 1984, the date he had been in a motor vehicle accident. (R. 83-85). The ALJ determined that, based on Claimant's earnings record, he first reached insured status for the purposes of SSDI on April 1, 1985; his date last insured was March 31, 2009. (R. 23-24, 230).

On June 1, 2018, ALJ Kuperstein issued an unfavorable decision, finding that Claimant had no severe impairments and therefore was not disabled under the Social Security Act at any point during the relevant period. (R. 20-22).

Plaintiff requested review by the Appeals Council on August 6, 2018, (R. 207), and submitted additional medical record evidence three times in support thereof. (R. 6-7, 10, 11-19). On May 28, 2019, the Appeals Council denied Plaintiff's request for review, rendering ALJ Kuperstein's decision the final decision of the Commissioner. (R. 1-6).

Claimant filed a *pro se* appeal of the Commissioner's final decision in this Court on July 25, 2019. [ECF No. 1]. On August 19, 2019, Claimant moved the Court for appointment of counsel, [ECF No. 8], which was denied on August 26, 2019 without prejudice to refiling after the Commissioner filed the administrative record on the docket, which might allow the Court to judge the likely merit of the case. [ECF No. 11 ("Here, the administrative record has not been filed, and 'it is too soon for the court to determine whether [Claimant's] claims pass the test of likely merit.'") (citing *McCormick v. Comm'r of Soc. Sec.*, No. 3:16-cv-00931 (AVC) (RAR), 2016 WL 11613848, at *1 (D. Conn. Nov. 1, 2016)].

The Commissioner filed the Certified Administrative Record of the proceedings before the Social Security Administration on October 7, 2019, [ECF

3

No. 20], and the Court filed an Amended Scheduling Order setting the date for Claimant's Motion to Reverse the Decision of the Commissioner to December 7, 2019. [ECF No. 21]. Claimant did not renew his motion to appoint counsel following the filing of the Certified Administrative Record, nor did he file a motion to reverse by the due date, December 7, 2019.

When Claimant failed to file his Motion to Reverse the Commissioner's Decision on December 7, 2019, as Ordered, the Court Ordered Claimant to Show Cause why the case should not be dismissed for failure of Claimant to diligently prosecute his case under Federal Rule of Civil Procedure 41, and Ordered Claimant to file his Motion to Reverse by January 3, 2020, or suffer dismissal. [ECF No. 22]. Claimant filed a motion styled as a Motion to Reverse on January 3, 2020, as Ordered, but in reality that filing was a motion to extend the time to file, [ECF No. 23], which the Court granted, setting a final deadline for filing by Claimant on September 7, 2020. [ECF No. 28]. The Commissioner filed his Motion to Affirm the Decision of the Commissioner on March 3, 2020, the Ordered due date, [ECF No. 25], and Claimant timely filed his Motion to Reverse on September 8, 2020. [ECF No. 29].[2]

### A. Relevant Medical History

The medical record reflects that Claimant suffers from, *inter alia*, traumatic brain injury, multiple fractures, pinched nerves, memory loss, and anxiety. The

---

[2] This Motion was timely because September 7, 2020 was a federal holiday, which made the deadline September 8, 2020, by rule. *See* Fed. R. Civ. P. 6(a)(1)(C).

4

Court will address Claimant's medical history only as it relates to issues raised by the Parties.

### B.     Claimant's Hearing Testimony

At the March 8, 2018 hearing Claimant testified that he lived in a house with his wife and 15-year-old son. (R. 68). He mowed the lawn. (R. 68-70). He regularly drove to the grocery store and occasionally drove to pick up his son from school. (R. 71-73). Claimant preferred to drive himself than to have his wife drive, and he normally drove when it was just the two of them. (R. 73).

Claimant testified that he had graduated with a bachelor's degree from the Rochester Institute of Technology ("RIT") in 1993. (R. 75). He had worked as an estimator for Commercial Printers of New Haven and Allied Printing of Manchester, Connecticut from November 1993 through August 2000, estimating productions, but was "laid off" or "fired" from those jobs. (R. 75-78; R. 255). Following that he worked at several other print shops as a pressman's helper and in bindery. (R. 78). He worked in various substitute teaching positions from 2001 through November 2005. (R. 255). He also went back to school for two years for a teaching certificate but did not pass the certification test. (R. 78-79). While he was doing his student teaching, he criticized the teacher he was working with, and he felt that after that, "word got around or something that I wasn't such a nice guy" and he was not offered other teaching positions. (R. 79-80). After 2006, he did some real estate work as an independent contractor with Century 21 through 2014 or 2015. (R. 81-83). In the real estate job, he worked at least 40 hours a week. (R. 95-96).

5

When the ALJ remarked that it appeared that Claimant worked, during the relevant period, "well above levels consistent with substantial gainful activity" Claimant stated, "I just had to prove everyone wrong." (R. 85).

When the ALJ asked Claimant "what's been preventing you from doing regular work activity since 1984," Claimant replied, "I think it's my attitude." (R. 87). Claimant also noted that his whole-body soreness was also a factor. *Id.*

### C. Claimant's Family Members' Hearing Testimony

Claimant's wife testified that Claimant had been struggling all his life that she had known him. (R. 98). She stated that he could barely walk and could not do much around the house. (R. 99). She testified that Claimant had been a little better in 2009, but it was getting worse and worse. (R. 99). She testified that she assisted Claimant with his real estate work with completing forms and making sure dates were calendared, but he took care of the clients himself. (R. 99-100).

Plaintiff's sister Kathleen Coulombe testified that she saw Claimant once a week for dinner and card playing. (R. 103-04). Ms. Coulombe testified that it was not until recently that Claimant actually needed or asked for help. (R. 105-06). She stated that after his accident, he did not want to go on disability and worked very hard to prove people wrong. (R. 106). She stated that since he has gotten older, he has been in more pain and it has been harder for him to do things physically. (R. 106). She stated that she did not think he was employable. (R. 107). She stated that before April 2009, he was trying to work and doing his best, but doors were "shut in his face." *Id.* She stated that he had to find different lines of work because his limitations had started. *Id.* She stated that she felt his biggest limitation, since

well before 2009, was that he got easily frustrated and came off aggressive because of his brain injury. (R. 108).

Claimant's sister Jane Markovitz testified that she saw her brother about once a week for dinner at his house. (R. 110-11). Ms. Markovitz testified that Claimant had tried his best and struggled to work and provide for his family for a long time without getting services, but that he now needed assistance. (R. 111). She testified that she felt the traumatic brain injury had prevented him from holding jobs because he got too emotional. *Id.* She stated that she felt he had the same limitations prior to April 2009 that he had at the time of the hearing, but he was focused on proving people wrong. (R. 112). She also felt his memory had worsened recently and he was more emotional. (R. 112).

### D.    Vocational Expert's Testimony

Warren D. Maxim testified at the hearing as a vocational expert. (R. 122-36). He testified that Claimant's prior work during the relevant period included, based on Claimant's testimony and the record evidence, work as a printing estimator, print shop helper, teacher's aide, plate maker in printing, printing press operator, and real estate sales agent. (R. 123-24).

The vocational expert testified that a hypothetical person of the Claimant's age, education, and vocational background, with the capacity to perform only light work, would be able to do his past relevant work and other jobs in the national economy. (R. 128).

The vocational expert also testified that this hypothetical individual, theoretically limited further to only frequent reach and handling, fingering, or

feeling with his right dominant upper extremity, could not do the plate maker, press operator, and print shop helper jobs, but could still do the printing estimator, teacher's aide, and real estate sales agent jobs. (R. 129). These three jobs could still be done if the hypothetical individual was further limited to no complex tasks. *Id.*

The vocational expert testified that all work would be precluded for someone who was expected to be off task for more than 15% of the workday. (R. 129-30).

After the hearing, the ALJ allowed Claimant and any family members to use the ALJ's conference room to double check the record evidence to ensure the records Claimant had of his disability were included in the administrative record. (R. 64-65). In addition, the ALJ left the record open for one week to allow Claimant time to submit any additional evidence or to request an extension of time for good cause. (R. 359).

### E.     The ALJ's Decision

ALJ Kuperstein made several findings in his decision on June 1, 2018 which are subject to review by this Court. ALJ Kuperstein found that Plaintiff first met insured status for the purposes of entitlement to SSDI on April 1, 1985, and last met the insured status requirement on March 31, 2009. (R. 23, 26). The ALJ determined that Claimant engaged in substantial gainful activity from January 1987 through December 1990 and from January 1993 through December 2000. (R. 26). The ALJ found that Claimant had medically determinable impairments of history of TBI, history of multiple fractures, history of pinched nerves, history of memory loss, history of anxiety, and history of arthrocentesis, or the withdrawal of fluid from bodily tissue. (R. 26).

ALJ Kuperstein found that through the date last insured, Claimant did not have an impairment or combination of impairments that were severe enough to significantly limit his ability to perform basic work-related activities for 12 consecutive months. (R. 26-31). Therefore, the ALJ found that Claimant was not disabled under the Act prior to the expiration of his insured status. (R. 31).

## II. Legal Standard

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)). Accordingly, the court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even

**where there may also be substantial evidence to support the plaintiff's contrary position***.  Schauer v. Schweiker***, 675 F.2d 55, 57 (2d Cir. 1982).**

**Thus, "[i]n reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).  "'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").  The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted).  "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'"  *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).**

The Social Security Act establishes that benefits are payable to individuals who have a disability.  42 U.S.C. § 423(a)(1).  "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."  42 U.S.C. § 423(d)(1).  An "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment must be one which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner:

1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ["Step One"].

2. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment," or "combination of impairments that is severe and meets the duration requirement," which significantly limits his physical or mental ability to do basic work activities ["Step Two"].

3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ["Step Three"].  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.

4. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the Residual Functional Capacity ("RFC") to perform his past work ["Step Four"].

5. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform ["Step Five"].

11

20 C.F.R. § 404.1520.

### III. The Parties' Arguments

Claimant moves for reversal on two grounds.

First, Claimant argues that ALJ Kuperstein was "semi-hostile" to him during his hearing and would not let him testify. [ECF No. 29 at 1]. As a result, Claimant "believe[s] a clearer look at my complete overall physical health is warranted, and [the ALJ's] decision order is not taking all factors into consideration." *Id.*

The Commissioner argues that "[t]he ALJ correctly found that, during the relevant period, [Claimant] had no severe impairment or combination of impairments within the definition of the Act," and thus correctly determined that Claimant was not disabled. [ECF No. 25-2 at 4]. This is so, according to the Commissioner, because even though the Second Circuit has cautioned that the Step Two severity determination is "*de minimus*, and intended to screen out only the weakest claims," Claimant did not meet his burden to show that the "significant injuries" he suffered in the 1984 car accident "had a more than minimal effect on his ability to perform basic work activities for any consecutive 12 months during the relevant period," given that he had gotten a bachelor's degree from RIT and had held down several substantial jobs during the relevant period. *Id.* at 4-5 (citing *Dixon v. Shalala*, 54 F.2d 1019, 1030 (2d Cir. 1995)). That Claimant's injuries were not severe was especially so, according to the Commissioner, because the record evidence showed "only a scant five doctor's visits during the . . . relevant period," and "[o]f those, only one, in March 2004, was related to the conditions that [Claimant] alleges to be disabling. *Id.* at 6 (citing R. 473-78, 560).

**Second, Claimant argues that the record was not sufficiently developed by the ALJ. [ECF No. 29 at 1 ("I don't believe my administrative record has been compiled completely or accurately . . . [and the ALJ's] decision order is not taking all factors into consideration. . . . [The ALJ] offered me opportunity to submit more documentations, but how was I to know how and what to submit.")].**

**The Commissioner argues that the ALJ "fulfilled his obligation to develop the record," even though the Claimant was** *pro se,* **which required the Commissioner to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence from any other sources on a consultative basis."** *Id.* **at 9 (quoting 42 U.S.C. § 423(d)(5)(B) and citing 20 C.F.R. §§ 404.1512(d), 416.912(d)). The ALJ met his burden because the "ALJ advised [Claimant] that he would accept and consider any evidence he wanted to submit that was not already in the claims folder," allowed Claimant to use the ALJ's conference room after the hearing to review the record evidence and determine if evidence Claimant had brought with him to the hearing was in the record or not, and allowed Claimant an extra week to submit any evidence he desired.** *Id.* **at 10. In addition, "[n]othing in the record suggest[ed] that there [we]re any existing medical records from the relevant period that were not before the ALJ," and "the ALJ possessed a complete medical history—insofar as one exists—with no obvious gaps."** *Id.*

## IV. Analysis

### A. Severity of Claimant's Impairments

The Court agrees with the Commissioner that the ALJ appropriately found that Claimant's impairments were not "severe" within the meaning of the statute during the relevant period. First, Claimant was able to complete a bachelor's degree from the Rochester Institute of Technology, which indicates that Claimant's TBI had little to no effect on his functioning mental capacity. Second, Claimant was able, for virtually the entirety of the relevant period, to hold down technical jobs in the print industry, work as a teacher's aide, and work for a long period of time as a realtor with Century 21. If Claimant had severe impairments, he would not have been able to work as extensively as he did. Moreover, any troubles Claimant did have with employment during the relevant period were likely more consistent with his admitted "attitude" or his admitted lack of tact than with any medical condition Claimant was suffering from.

The Court has also reviewed the ALJ hearing transcript in detail and finds that while there was some initial back and forth while the ALJ set the grounds rules for the hearing, Claimant was able to and did testify extensively about all aspects of his history and his impairments. Claimant asserts that the ALJ was "semi-hostile," but that does not come through clearly, if at all, in the hearing transcript, and to the extent that is true the Court finds that the ALJ's demeanor did not infect his treatment of the record evidence.

In sum, the Court finds that substantial evidence supported the ALJ's determination that Claimant had no severe impairments during the relevant period, and was, therefore, not disabled.

### B. The ALJ's Development of the Record

The Court agrees with the Commissioner that the ALJ "fulfilled his obligation to develop the record," even though the Claimant was *pro se*, which required the Commissioner to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence from any other sources on a consultative basis." [ECF No. 25-2 at 9 (quoting 42 U.S.C. § 423(d)(5)(B) and citing 20 C.F.R. §§ 404.1512(d), 416.912(d))]. As the Commissioner points out, the "ALJ advised [Claimant] that he would accept and consider any evidence he wanted to submit that was not already in the claims folder," allowed Claimant to use the ALJ's conference room after the hearing to review the record evidence and determine if evidence Claimant had brought with him to the hearing was in the record or not, by comparing his records to the evidence already in the record, and allowed Claimant an extra week to submit any evidence he desired. *Id.* at 10.

In sum, the ALJ took steps to ensure this *pro se* claimant had the opportunity to supplement the record, and "[n]othing in the record suggest[ed] that there [we]re any existing medical records from the relevant period that were not before the ALJ," *id.* at 9, nor does Claimant so argue. The ALJ also afforded Claimant the opportunity to verify the sufficiency as well as the accuracy of the record.

### V. Conclusion

For the foregoing reasons, Claimant's Motion for Order Reversing the Decision of the Commissioner is DENIED, and the Commissioner's Motion for

Order Affirming the Commissioner's Decision is GRANTED. The Clerk is directed to close this case.

                                              **IT IS SO ORDERED.**

                                              _/s/_
                                      **Hon. Vanessa L. Bryant**
                                      **United States District Judge**

**Dated at Hartford, Connecticut: September 15, 2020.**